1  Todd C. Theodora, Esq. (State Bar No. 120426)
   ttheodora@tocounsel.com
2  Allan L. Schare, Esq. (State Bar No. 126305)
   aschare@tocounsel.com
3  Jason L. Haas, Esq. (State Bar No. 217290)
   jhaas@tocounsel.com
4  THEODORA ORINGHER PC
   535 Anton Boulevard, Ninth Floor
5  Costa Mesa, CA 92626-7109
   Telephone: (714) 549-6200
6  Facsimile: (714) 549-6201

7  Nicholas S. Chrisos (State Bar No. 70442)
   Orange County Counsel
8  Jeffrey M. Richard (State Bar No. 105286)
   Senior Assistant County Counsel
9  jeffrey.richard@coco.ocgov.com
   Elizabeth A. Pejeau (State Bar No. 210299)
10 Deputy County Counsel
   liz.pejeau@coco.ocgov.com
11 Office of County Counsel
   County of Orange, California
12 Hall of Administration
   P.O. Box 1379
13 Santa Ana, CA 92702-1379
   Telephone: (714) 834-2002
14 Facsimile: (714) 560-4552

15 Attorneys for Plaintiff County of Orange

16

17          **UNITED STATES DISTRICT COURT**

18   **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

19

20 COUNTY OF ORANGE, a political          Case No.   **SACV13-683 JST(JCx)**
   subdivision of the State of California,
21                                        **COMPLAINT for:**
             Plaintiff,
22                                        1. PROMISSORY FRAUD
        vs.                               2. FRAUDULENT
23                                        MISREPRESENTATION
   TATA CONSULTANCY SERVICES              3. FRAUDULENT CONCEALMENT
24 LTD., an Indian corporation; TATA      4. NEGLIGENT
   AMERICA INTERNATIONAL                  MISREPRESENTATION
25 CORPORATION, a New York                5. BREACH OF CONTRACT
   corporation;
26                                        **[DEMAND FOR A JURY TRIAL]**
             Defendant.
27

28

917668.1/81185.05003

THEODORA ⫿ ORINGHER
COUNSELORS AT LAW

THEODORA ORINGHER
COUNSELORS AT LAW

## COMPLAINT FOR DAMAGES

Plaintiff County of Orange, a political subdivision of the State of California, hereby sues defendants Tata Consultancy Services Ltd. and Tata America International Corporation, demands a jury trial, and alleges the following:

## PREFACE

1.     Beginning in 2007, the County engaged defendant Tata America International Corporation, a subsidiary of defendant Tata Consultancy Services Ltd. that operates as "TCS America," to develop custom software to handle the operations of most of the County's property tax functions. The County selected defendants for the project on the basis of what the County later discovered to be a series of false promises and intentional misrepresentations made by both defendants to the County. In short, defendants promised they had the capabilities to perform a project that was well beyond the capabilities of the personnel the defendants intended to provide for the project, and the defendants made promises to complete the project on a budget and according to a timeline with which they had no intention of complying.

Despite the County assigning a number of its technical, administrative, and business personnel to work with defendants for years to address the issues plaguing the software project, and despite the County granting defendants additional time and money to complete the project, in January 2013 the County had no alternative but to bring the project to an end short of completion. In late 2012, the County discovered the software the defendants had designed to date was fatally flawed and was not in accord with the rules the County and the defendants had agreed to years earlier. The County has suffered millions of dollars of damages as a result of defendants' wrongful conduct, and it will continue to suffer damages for the years it will take to develop a replacement for the failed project. The County asserts claims herein for promissory fraud, intentional misrepresentation, fraudulent concealment, and negligent misrepresentation against both defendants, and a claim for breach of contract against defendant Tata America International Corporation.

## PARTIES

2.     Plaintiff County of Orange ("County" or "Plaintiff") is now, and at all times material to this action has been, a subdivision of the State of California and a charter county organized and existing under the laws of the State of California.

3.     Defendant Tata Consultancy Services Ltd. ("TCS Limited") is an Indian corporation headquartered in Mumbai, India.   TCS is a large international conglomerate, part of which includes a large group that develops custom software.

4.     Defendant Tata America International Corporation ("TCS America") is a New York corporation.   The County is informed and believes, and upon that basis alleges, that TCS America is a wholly-owned subsidiary of TCS Limited and operates as an integrated functional unit with TCS Limited, sharing employees and dividing work on common projects.

5.     Plaintiff is informed and believes, and upon that basis alleges, that at all times herein mentioned, each of the defendants was the agent, servant, and/or co-conspirator of the other defendant, and, in doing the acts hereinafter alleged, was acting within the course and scope of its authority as such agent, servant, and/or co-conspirator with the permission and consent of its co-defendant and, further, that the defendants, and each of them, have authorized, ratified, and approved the acts of the other defendant with full knowledge of those acts.

6.     The County is informed and believes, and upon that basis alleges, that TCS Limited and TCS America acted in concert with respect to most of the events detailed herein, and, accordingly, shall be collectively referred to herein as "TCS."   Where appropriate to distinguish between the two entities, the allegations shall identify the specific defendant.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction under 28 U.S.C. § 1332 because the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000 and is between citizens of different states.   Diversity jurisdiction exists because Plaintiff is a political

1  subdivision of the State of California, whereas defendants are citizens of other states or

2  countries.

3       8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2)

4  because a substantial part of the events or omissions giving rise to Plaintiff's claims

5  occurred in this district.

6       9.     Venue is further proper in this judicial district because the County and

7  TCS America agreed in their contract, effective July 15, 2008, that "[i]n the event of

8  any legal action to enforce or interpret [the] Agreement, the "sole and exclusive venue

9  shall be a court of competent jurisdiction located in Orange County, California…."

10                         **FACTUAL BACKGROUND**

11                *Property Tax Management in Orange County*

12       10.     One of the primary funding sources for governmental entities and agencies

13  throughout the State of California, including in the County of Orange, is from the

14  assessment of local property taxes.   Within the County, more than $4.5 billion in

15  property taxes are assessed and collected each year to pay for schools, County services,

16  services provided by 34 separate Orange County cities, and services provided by

17  various special governmental districts.  Although the County of Orange retains only a

18  small percentage of this amount for its own budget (lower than other counties in the

19  State), disbursing the balance to the schools, cities and districts, the County is entrusted

20  with the crucial task of assessing and collecting property taxes on behalf of all the

21  governmental agencies that receive a share of the funds.

22       11.     Managing the property tax system in Orange County is a substantial

23  logistical undertaking.  Taxes are assessed on more than 1,000,000 pieces of property

24  each year— over 800,000 parcels of real property and an additional 200,000 forms of

25  business property (such as trade fixtures, boats, and planes).  Valuations for each piece

26  of property have to be set each year. Then taxes have to be calculated for each piece of

27  property, with the applicable tax rate influenced by a variety of factors that cause the

28  amount owed to vary significantly across the geographic subdivisions within the

THEODORA ORINGHER
COUNSELORS AT LAW

1  county, with a total of over 4,500 different tax rate areas.  Property bills must then be
2  issued, and the taxes collected.  Taxpayer appeals must be handled.  Once collected, tax
3  revenues must be allocated and distributed by the County to the proper government
4  entity.  And, for a variety of political, legal, and other reasons, the rules governing these
5  various functions change over time.

6       12.    Efficiently and accurately managing the property tax process requires
7  significant technological assistance.  In the 1980s and 1990s, the County developed a
8  mainframe-based computer system, referred to as the ATS System, to handle all
9  property tax processes.

10                ***The County's Need for a New Property Tax Management System***

11       13.    The ATS system was successfully deployed and has been operational since
12  its original implementation, but as the years passed, the County faced increasing
13  challenges in operating and maintaining it.  In part, this was a result of the evolution of
14  computer technology from centralized, mainframe-based servers to more flexible web-
15  based servers.  Another major factor, however, was that the ATS system was created
16  using a now-obsolete programming language.  By the late 1990s, it became clear that
17  the ability to support the ATS system would become increasingly difficult as the
18  system's programming language was no longer being used for new programs, was not
19  being taught in schools, and was no longer supported even by the company with the
20  rights to the computer language.  In fact, the County has had to retain the services of
21  two consultants for over *twenty years* simply in order to maintain the ATS system.

22       14.    By 2001, the County determined it had to replace the increasingly obsolete
23  ATS system. The County decided to replace the ATS system with two systems: one to
24  handle the property tax functions for the assessor's office (ATS 2.0) and a second
25  system to handle all of the other property-tax related functions.  This second planned
26  system became known as the Property Tax Management System ("PTMS").  Once
27  implemented, the PTMS system would be used by three separate County offices: the
28  Auditor-Controller, the Treasurer-Tax Collector, and the Clerk of the Board.

15.     The new PTMS system had to be created through a custom software development process. No "off-the-shelf" software was available in the marketplace that was suitable for a county the size of Orange County and that could be adapted to the County's needs, given the unique issues posed by Proposition 13 and other aspects of California property tax law.  In order to meet the challenges posed by the scale and complexity of the County's property tax system, software would have to be designed specifically to work within the County's technology infrastructure and to perform the tasks needed by the County. As the County lacked the expertise, staffing or resources to develop such software itself, the County determined that it would have to hire a contractor that did have the resources and expertise for the job.

### The County Prepares for the Development of a PTMS Application

16.     The County carefully and systematically planned its process for developing the PTMS system because it knew that it would take a substantial period of time and millions of dollars to develop a system that could operate successfully for many years into the future.

17.     In addition to having a PTMS system that could accurately and efficiently handle property tax on over a million different pieces of property, the County had additional goals for PTMS that were just as important, including reliability, maintainability, and scalability. That is, the new PTMS system had to be built in such a way that the County could easily maintain it, update it, change it, and expand it over the years. This meant that the new software, even if it functioned perfectly at the beginning, could not be simply a "black box." Instead, the PTMS software had to be designed in a clear, logical and efficient manner that would make it easy for future County programmers and other IT staff to understand, maintain and update.  A clear, logical and efficient design then had to be reinforced by formal documentation that explained the architecture of the program by tracing the business requirements to be met by the software to the screen and user functions that met those requirements, and then to the specific source code that performed those functions. Such "requirements tracing" was

1   also essential so that when changes to the source code were needed, the right sections of
2   code could be found among the millions of lines of programming that would make up
3   the entire PTMS software. Explanatory comments built into the code itself were further
4   needed to clarify the PTMS program's purpose and operations. Collectively, these
5   goals for the PTMS system will be referred to below as the County's "Sustainability
6   Goals" for PTMS.

7      18.   An important step in the County's preparations for hiring a contractor to
8   construct the PTMS software was to conduct a thorough needs assessment and to
9   document requirements for the future system. The County contracted with an outside
10  company, Sierra Systems, which put a team of specialists on-site at the County for
11  about fifteen months to develop a comprehensive and detailed list of the business
12  functions that a new PTMS application would need to perform. The final product of
13  this needs assessment was a document of over 6,000 pages, which identified more than
14  20 separate functional areas to be addressed and which provided a set of supplementary
15  specifications for legal and regulatory requirements, application standards, usability,
16  reliability, performance, supportability, operating systems and environments,
17  compatibility requirements, and design constraints (the "Needs Assessment").

18     19.   With the Needs Assessment in hand, the County prepared a Request for
19  Proposal ("RFP") and provided notice of the RFP to potential contractors. The RFP
20  included excerpts of the Needs Assessment to educate potential bidders on the nature
21  and complexities of the PTMS project. Potential bidders also received an opportunity
22  to review a hard copy of the full Needs Assessment at a September 2007 question and
23  answer session held by the County prior to submitting their bids. Representatives from
24  TCS attended that question and answer session and reviewed the Needs Assessment.
25  Ultimately, six contractors submitted responses to the County with bids to create the
26  PTMS application, including TCS.

27

28

THEODORA ORINGHER
COUNSELORS AT LAW

*The County Chooses to Negotiate with TCS to Develop the PTMS*

20.    On or about November 2, 2007, TCS submitted a response to the County's RFP with its bid for the PTMS project.

21.    In pertinent part, TCS's response included the following representations, which the County later discovered constituted misrepresentations and/or promises or representations made without any intent to perform and/or without any intent to provide the level of expertise and staffing for the project that were represented:

(a) that TCS completed 96% of all projects on-time and on-budget (the "Performance Misrepresentation");

(b) that TCS was the world's first information technology company to achieve an "Enterprise wide CMMI Level 5 certification," a business certification indicating that the processes used by TCS to design and develop software were, allegedly, "extremely mature" and that those processes were designed to be quantifiable, repeatable, and able to ensure the optimal possible output (the "Quality Representation");

(c) that the PTMS program could be completed within 25 months (i.e. by February 2010 if the project started in January 2008) (the "Timeline Misrepresentation");

(d) that the total cost to the County for the PTMS project would be $7,986,580 (the "Cost Misrepresentation");

(e) that, in addressing an RFP requirement that responses identify the "project manager and key personnel *who will be assigned to this project,*" (emphasis added), and to provide resumes for "the personnel *who will be providing the service to the County,*" (emphasis added), TCS identified sixteen individuals by name and by their assigned role for the PTMS project. TCS also provided the resumes of these sixteen individuals to the County for review (collectively, the "Personnel Misrepresentation");

(f) that, in order for TCS to meet the technical and business requirements of the PTMS project, TCS "felt that additional outside expertise was *essential*"

THEODORA ORINGHER
COUNSELORS AT LAW

1  (emphasis added), and that, accordingly, TCS had "engaged two senior advisors with

2  specialized expertise in property tax in California": Terri Sexton, a professor in

3  economics from California State University with nearly 30 years of experience with

4  California property tax law; and Sam Birchfield, the Property Tax Lead for Ryan and

5  Company, which was the "leading tax services firm in North America, with the largest

6  transaction tax practice in the United States…" (the "Experts Misrepresentation").

7  (Professor Sexton and Ms. Birchfield were two of the sixteen individuals identified in

8  the Personnel Misrepresentation); and

9          (g) that, in keeping with County requirements in the RFP, TCS proposed

10  that all work on the PTMS project be performed onsite at the County offices in Orange

11  County.

12          22.     Both TCS's response to the RFP and the cover letter submitted with that

13  response were signed by Surya Kant, President of TCS America.  The response was

14  then submitted to the County by Robert Carberry, a Senior Business Development

15  Manager for TCS America. Mr. Carberry served as TCS's point person throughout the

16  RFP process.

17          23.     TCS's response to the RFP was formally submitted on behalf of TCS

18  America, but each of the misrepresentations and representations identified in paragraph

19  21 were made on behalf of TCS Limited as well.

20          24.     Throughout the RFP response, and in all communications with the County,

21  TCS presented TCS Limited and TCS America as being a single integrated entity and it

22  informed the County that the County would benefit from both companies' expertise,

23  personnel, and other resources.  In fact, the response to the RFP generally used the term

24  "TCS" interchangeably to refer to both TCS America and TCS Limited.  Indeed, many

25  of the representations relating to "TCS" in the response could have only referred to

26  TCS Limited.  For example, the Quality Representation relating to the CMMI Maturity

27  Level 5 certification specifically referenced a global certification process, not a review

28  of TCS America's processes or procedures.  In a second example, "TCS" represented

THEODORA ORINGHER
COUNSELORS AT LAW

1   itself as having "completed projects for over 1,000 clients in more than 55 countries"
2   and as employing more than 100,000 associates (at a time when TCS America had
3   approximately 15,000 employees). The County is informed and believes, and upon that
4   basis alleges, that many of the project members "TCS" proposed to devote, or devoted,
5   to work on the PTMS project worked and lived in India for TCS Limited or one of its
6   Indian subsidiaries.

7      25. The County assembled a team of in-house personnel to evaluate the six
8   RFP responses. Each response was scored in six categories, after which the average
9   score for each category was determined and then weighted by the importance of the
10   category. More than half the weight in the scoring was placed on just two categories,
11   (1) the method and technology used by the contractor and (2) the proposed project
12   team's experience and structure, as the County was determined to ensure that the
13   selected contractor would have the necessary knowledge and expertise to develop the
14   PTMS software through to a successful conclusion.

15      26. After the six responses were evaluated, the County selected two finalists
16   for interviews, including TCS. On or about January 15, 2008, TCS employees Robert
17   Carberry, Jeff Snyder, Atul Srivastava, and others made a presentation to County
18   employees, including Mahesh Patel, Clarissa Adriano-Ceres and others, at which TCS
19   reaffirmed the terms of its RFP, including, at a minimum, the Performance
20   Misrepresentation and Quality Representation.

21      27. Following the interviews and related communications, the County decided
22   to negotiate a contract for the PTMS project with TCS. On or about April 15, 2008, the
23   Orange County Board of Supervisors approved this step, based in part on a
24   recommendation by the Orange County Treasurer Tax-Collector that identified the
25   reasons for the County's selection of TCS. The reasons presented for the selection of
26   TCS, and relied on by the County in deciding to enter negotiations with TCS, included
27   references to TCS's Performance Misrepresentation, Quality Representation, Personnel
28   Misrepresentation, and Experts Misrepresentation.

THEODORA ORINGHER
COUNSELORS AT LAW

*The County Enters into a Contract with TCS America*

28.     Since the RFP included a model contract for the PTMS project and TCS agreed to nearly all of the terms in that model contract, most of the negotiations between the County and TCS focused on the "Statement of Work" ("SOW") for the PTMS project.  The final SOW laid out a detailed process through which the PTMS software would be designed and developed.  The SOW established that the first phase of this process would set forth the parameters for the final software product in a number of separate project documents that would collectively guide all further development.

29.     During the course of these contract negotiations, a series of conference calls took place between the County and TCS.  TCS employee Jeff Snyder led the negotiations for TCS, joined by TCS employees Ravi Nandivado, Atul Srivastava, Robert Carberry, and others.  Purchasing agent Colleen Avila took the lead for the County, joined by other County employees, including Mahesh Patel, Clarissa Adriano-Ceres, and others.  A portion of these calls focused on developing the project plan and schedule to be included in the contract, which gave TCS an opportunity to negotiate and to seek to amend the terms of the project plan and schedule TCS had included in its response to the RFP.  During this time period, TCS received and reviewed a full electronic copy of the Needs Assessment, so that TCS could rely on it in negotiating the project plan and schedule to be included in their final contract.  In the course of these calls, TCS reaffirmed the representations it made in its response to the County's RFP.  TCS did not disavow any of the representations and misrepresentations identified above in paragraph 21 at any time prior to the parties entering into a contract.

30.     In one of the first conference calls, which took place in the spring of 2008, the two negotiation teams were joined by Terri Sexton and Sam Birchfield on behalf of TCS.  During the course of that call, Ms. Sexton and Mr. Birchfield were introduced to the County's negotiating team by Robert Carberry as the property tax

1  experts who would work on the project as TCS's "Tax Advisory Group,"

2  reaffirming the Experts Misrepresentation.

3     31.   In several of the conference calls, the County's representatives also

4  discussed the Sustainability Goals for the PTMS System at length with TCS.  TCS's

5  employees indicated they understood these Sustainability Goals were key objectives

6  of the County and agreed that a final PTMS system would achieve them. (The

7  importance of the Sustainability Goals was referenced in the original agreement and

8  later confirmed in the May 2009 "Quality Management Plan" agreed to by the

9  parties.)

10    32.   Once the SOW was completed, the County and TCS America agreed to

11 a "Contract for Professional Services for the Development and Implementation of

12 the Property Tax Management System (PTMS)," to be effective July 15, 2008 (the

13 "Original Contract").  In pertinent part, the Original Contract:

14        (a) provides that TCS America was to be paid $7,986,581 to complete

15 the PTMS software, subject to additional charges for any services performed as the

16 result of a change order (¶3), thereby reaffirming the Cost Misrepresentation;

17        (b) provides that TCS agrees to accept that stated contract price as

18 compensation in full for all services, for all *reasonably unforeseen difficulties*

19 *which may arise or be encountered in the execution of the services until*

20 *acceptance"* (emphasis added), and for all risk associated with the services, and

21 states that in no event shall TCS be paid more than the specified contract price for

22 the 3-year term of the contract (¶3);

23        (c) calls for the PTMS software to be completed and implemented in

24 twenty-five (25) months, i.e., by July 31, 2010 with a contract start date of July 15,

25 2008.  The official term of the contract was set for three years, from July 15, 2008 to

26 July 15, 2011, with the option of two one-year renewable periods. (¶2)  A post-

27 implementation services period covered the time period between the final

28 implementation date and the end of the contract's term.  These provisions

1   effectively reaffirmed the Timeline Misrepresentation;

2       (d) declares the "[t]ime of delivery of goods and services is of the

3   essence in this Agreement" (¶14);

4       (e) sets out an exhaustively-defined work process to manage the PTMS

5   project (Att. A, at 26-68):

6       (i) The PTMS Project was divided into five basic stages: an

7   initial project planning stage, three product development stages (or "tiers"), and a

8   project closure stage.

9       (ii) The functional areas of tasks identified in the Needs

10   Assessment were converted into 25 "modules," which were processed in one of the

11   three tiers, with between seven and ten modules per tier.  The modules perceived to

12   be more straightforward and simpler to complete were selected for Tier 1, so that the

13   parties could give TCS an opportunity to acquaint itself with the County's business

14   processes and to validate its design of several less-complex modules before taking

15   on the more difficult modules in Tier 2 and Tier 3.

16       (f) The Original Contract also states that TCS America "expressly

17   warrants that…for a period of (90) days after the acceptance of a software

18   deliverable ("warranty period"), *such deliverable will*, when operated in accordance

19   with its documentation, *conform to and provide the functionality in accord with its*

20   *specifications. [TCS America] further warrants that all work required to be*

21   *performed hereunder shall conform to the descriptions contained in this Agreement*

22   *and will be performed in a professional manner according to generally accepted*

23   *industry standards*." (¶15 (emphasis added).);

24       (i)    The warranty included in the Original Contract served two

25   primary purposes.  First, the warranty period provided for an ongoing and active

26   role in the project by TCS following the implementation of the PTMS system to

27   ensure that any "bugs" or other problems that were not discovered until the PTMS

28   system started operating in a live network environment would be identified and

corrected.  By the end of the warranty period, the PTMS system was expected to be stable and ready for the County's IT staff to operate and maintain going forward. Second, and relatedly, during the warranty period, TCS would train the County's IT staff regarding the operations and maintenance of the PTMS program, so that those staff would have the necessary expertise to oversee the program in the absence of the TCS team that had developed the program.

(ii)    The County is informed and believes, and upon that basis alleges, that the limitation on the duration of the warranty period did not constitute, and was not understood by the parties to constitute, any limitation on TCS's commitment to provide the County with fully-functioning PTMS software that would, with regular maintenance, serve the County's property tax needs for many years.

(iii) Following a series of problems in the early stages of the project that revealed the poor quality of TCS's initial versions of the PTMS software—which are alleged in detail below—the 90 day warranty period in the Original Contract was extended to 180 days.  This extension, which was made at the County's insistence, was adopted to provide additional time for problems with the PTMS program to be identified and corrected before TCS's work on the project could be considered complete.

(g) The Original Contract requires that *TCS America "shall perform all work under this Agreement,* taking necessary steps and precautions to perform the work *to the County's satisfaction.  [TCS America] shall be responsible for the professional quality, technical assurance, timely completion and coordination of all documentation and other services* furnished by [TCS America] under this Agreement.  *[TCS America] shall perform all work diligently, carefully, and in a good and workman-like manner....*" (¶23 (emphasis added)); and

1      (h) The Original Contract requires TCS America to design the

2  "technical architecture" of the PTMS program and to ensure that the PTMS

3  software, as designed, conforms to that architecture.

4          (i)    The "technical architecture" of a software application is, in

5  layman's terms, the map of how a program such as PTMS works with, and

6  communicates among, multiple types of computers and servers, which can include,

7  without limitation, database servers, application servers (a/k/a business layer), and

8  the end-user computers that interface with those other computers through a web

9  browser or other interface.[1]  Some tasks may be assigned to a specific type or

10 "layer" of the application, while other tasks may be split across, or performed

11 simultaneously by, different layers to perform a particular task efficiently.  For the

12 purposes of this Complaint, the "technical architecture" also includes the rules and

13 procedures for different parts of the system to communicate with each other, as well

14 as features such as security, tracking changes made to data in the system ("audit

15 functions"), and the documentation and comments in code that explain the

16 operations of the system.

17         (ii)    TCS was primarily responsible for "defin[ing] and

18 [design]ing the Solution Architecture [a/k/a technical architecture]" (Att. A., at 34).

19         (iii)   TCS's "Solution/Technical Architect" was "[r]esponsible

20 for leading the development of the application design and architecture (Solution

21 Blueprint)[] [and for] [v]erify[ing] development is consistent with design." (Att. A,

22 at 13.)

23         (iv)    Once the County accepted, in or about June 2009, the final

24 technical architecture document drafted by TCS, TCS agreed, in that separate

_____

26     [1] An application for which the computer operations is spread across three or more
27 separate computers in a network is typically referred to as having an "n-tier"
   architecture.  The PTMS application was intended to have an n-tier architecture.

1  acceptance document, that any changes to the agreed-upon technical architecture

2  would not be made without complying with the "Change Control procedure."  No

3  changes were ever made to the specifications for the PTMS technical architecture,

4  or agreed to by the County, under that procedure.

5      33.    On or about July 15, 2008, the County approved the Original Contract,

6  based in part on a recommendation by the Orange County Auditor-Controller that

7  included the proposed budget and term for the PTMS Project.  These were drawn

8  from the Original Contract, and specifically from the Cost Misrepresentation and

9  Timeline Misrepresentation.  The Original Contract was signed on behalf of the

10  County by a Deputy Purchasing Agent and approved as to form by Deputy County

11  Counsel.  Surya Kant, TCS America's President, and Satyanarayan Hegde, Senior

12  Vice President and General Counsel for TCS America, signed the Original Contract

13  on behalf of TCS America.

14                  ***The Stages of a Custom Software Development Project***

15      34.  The standard custom software development process among leading

16  providers in the software development industry—such as TCS represented itself to

17  be—contains seven stages:

18            (a) <u>Requirements Elaboration</u> – In this stage, the developer's business

19  analysts work with the client's employees who have been designated as "subject

20  matter experts" to generate a list of business requirements, which set forth the tasks

21  the new software will need to perform.  For the PTMS project, TCS was responsible

22  for elaborating upon the requirements already defined in the Needs Assessment.

23            (b) <u>High Level Design</u> – In this stage, the screens and steps that an end

24  user of the program would see are designed and agreed upon so both the developer

25  and the client understand how the final product is supposed to look.

26            (c) <u>Low Level Design</u> – In this stage, the business logic, processes, and

27  formulas connecting different screens and screen functions are compiled so that

28

1   programmers know the exact tasks, data, and rules the source code will need to use

2   to perform its functions.

3       (d) <u>Code Development</u> – In this stage, the programmers rely on the

4   requirements, the High Level Designs, and the Low Level Designs to write the code

5   that will actually make up the final program.  Each module in a final application

6   may require dozens, hundreds, or even thousands of subprograms that are developed

7   separately in this stage.

8       (e) <u>Unit Testing</u> –  In this stage, the programmers test each of the

9   subprograms to ensure they work as designed.

10       (f) <u>System Testing</u> – In this stage, the developers integrate the

11   individual subprograms into a larger subprogram, or into a complete module, and

12   test how the new subprogram works in conjunction with the other existing code to

13   identify and correct any errors.

14       (g) <u>User Acceptance Testing</u> – In this stage, the *client* tests each draft

15   module in the setting in which it will ultimately be used.  Once any final errors have

16   been identified and corrected in user acceptance testing, the software is ready to be

17   implemented by the client.

18       35. The software development process designed and proposed by TCS in

19   November 2007 included all the steps listed above *except* for High Level Design.

20       ***TCS's Inadequate Performance under the PTMS Contract***

21       36.    TCS's performance on the PTMS project failed to live up to the

22   representations and promises TCS made to the County and also failed to comply with

23   generally accepted industry standards.

24       37.    Both the managers and employees sent by TCS to Orange County lacked

25   the experience and expertise needed to successfully perform the PTMS project.

26       38.    On the management side, the TCS project manager with whom the County

27   spent months on the phone developing detailed project plans failed to show up with the

28   on-site TCS team.  Instead, he was replaced at the last minute by another manager who

1   lacked the qualities needed to drive a complex project on schedule.   That second

2   manager's shortcomings were sufficiently apparent that he was replaced less than seven

3   months later.  The third project manager was better than his predecessor but likewise

4   proved incapable of managing a complex project like the PTMS project. Yet TCS left

5   him in his position for more than two years despite a host of problems with TCS's

6   performance, as detailed further below.  Only in June 2012, *almost four years* after

7   starting work on the PTMS project, did TCS appoint a project manager, Manoj Singh,

8   with the requisite experience and skills, but by that point it was too late to rescue the

9   project.  Notably, TCS had promised at the outset, in its 2007 RFP response, that Mr.

10   Singh would be assigned to the PTMS project, but the County is informed and believes,

11   and upon that basis alleges, that Mr. Singh played no role in the PTMS project until

12   2011 and did not work on-site on the PTMS project until 2012.

13        39.     TCS's business analysts, who were supposed to develop the detailed

14   requirements for the PTMS project from the Needs Assessment, and after consultation

15   with the County's subject matter experts, often failed to have even the most basic level

16   of understanding about the problems the software was supposed to address.   For

17   example, one TCS employee assigned to draft the list of requirements to be addressed

18   by the PTMS's bankruptcy module met with County employees but quickly

19   demonstrated that he had absolutely no understanding of what a bankruptcy is, much

20   less the detailed knowledge and experience required to perform his assignment.

21   Another TCS employee who was supposed to address the functioning of an online

22   payment system had no familiarity with current online payment systems.

23        40.     The lack of expertise demonstrated by TCS's employees was exacerbated

24   by two additional issues.  First, TCS significantly understaffed the PTMS project.  A

25   number of project tasks required a specifically skilled and dedicated person, such as a

26   database administrator and system tester.  Instead, TCS often tasked one employee with

27   two full-time jobs, leading to poor or slow performance of both roles.  TCS also tried to

28   perform certain functions offsite, leading to unnecessary delays and communication

1   problems, particularly when the actual coding work was later moved offshore to TCS's
2   facilities in India.  Second, there was high turnover among TCS's onsite staff working
3   at the County, meaning that County employees often had to re-teach the subjects to new
4   TCS employees, further delaying progress on the project.

5       41.   A key factor in TCS's lack of expertise was its breach of, and blatant
6   disregard for, its promises to assign to the project the sixteen individuals TCS had
7   identified in its response to the County's RFP as "the personnel who will be providing
8   the service to the County" (i.e. the Personnel Misrepresentation).  The County is
9   informed and believes, and upon that basis alleges, that only five of the sixteen
10  promised personnel *ever* performed a role for TCS in providing services on the PTMS
11  project, and of those five, two (including Manoj Singh, *see* ¶ 38), were not assigned to
12  the PTMS project until two or more years had passed.  TCS also failed to replace the
13  promised personnel with individuals with equivalent experience or expertise.

14      42.   TCS's failure to provide the two California property tax experts proved
15  particularly troublesome, as the lack of understanding of those fundamental issues
16  repeatedly caused problems.  Those promised experts would have had the expertise
17  required to accurately interpret the functional processes and requirements defined in the
18  Needs Assessment.  They also could have facilitated communications between TCS's
19  business analysts and the County's subject matter experts and could have provided
20  TCS's employees an additional resource to get questions answered.  Despite TCS's
21  promises to engage such experts, despite its representations that their inclusion on the
22  PTMS project was "essential," and despite TCS's inclusion of both experts on a
23  conference call to negotiate the contract, the County is informed and believes, and upon
24  that basis alleges, that TCS never had either of those experts play a meaningful role, if
25  any role at all, on the PTMS project. The County formally requested that TCS provide
26  property tax experts to the PTMS project on at least two occasions—and it made
27  numerous informal requests to the same effect—but TCS never did so.

28

*TCS Repeatedly Violates Contractual Deadlines and/or Produces*
*Unusable Software*

43.   TCS began to miss deadlines almost from the beginning of the PTMS project. In the first stage, simply acquainting the TCS project team with the existing Needs Assessment and developing the guiding project documents—such as the Technical Architecture Document—took eight or more months, several months longer than TCS had promised in the Original Contract.

44.   <u>Tier 1</u> - In September 2009, TCS delivered the first batch of "Tier 1" modules to the County for user acceptance testing. This software was flawed in two major ways. First, although TCS had reportedly completed both unit testing and system testing on the modules and claimed the software was ready for County user acceptance testing, when the County tested TCS's work product, it found the modules contained so many errors (more than 380) that the County could not even complete the scheduled testing. Second, the lay-out of the modules was poor and difficult for County employees to comprehend or use. As a result of the problems with the draft Tier 1 modules, the County and TCS agreed to defer four of the nine Tier 1 modules until Tier 3 or into a new "Tier 1A," all with later delivery deadlines. Meanwhile, TCS was supposed to fix the remaining Tier 1 modules and return them to the County for further user acceptance testing and implementation. The County ultimately did not receive and accept the first reduced batch of Tier 1 modules until September 2010, nine months after the software would have been implemented if it had been of sufficient quality to pass the user acceptance testing in the Fall of 2009 (and almost fourteen months later than the Tier 1 implementation date set in the Original Contract). Even then, the Tier 1 modules delivered by TCS contained significant defects, and the County has only been able to use two of the smaller, less complex modules.

45.   As part of the agreed-upon PTMS process, County employees held a meeting in May 2010 to identify lessons learned from their experiences with the development of Tier 1. This meeting identified "Areas of Improvement" for each party.

1  The County engaged in this review process in good-faith, recognizing that the Tier 1
2  modules were, in part, intended to give TCS an opportunity to acquaint itself with the
3  County's business processes and to validate its design of several less-complex modules
4  before TCS undertook the more challenging Tier 2 and Tier 3 modules.

5      46.  Tier 1A – This new tier, created in or about November 2009, consisted of
6  only one module, the module for Assessment Appeals.  After missing the original
7  November 2009 deadline for Tier 1, TCS's deadline for completing system testing on
8  Tier 1A was extended to September 2010, giving TCS almost another whole year to
9  work on the module.  This deadline was extended several more times, yet in November
10 2010, TCS reported to the County that it was still finding an excessive number of errors
11 in its testing, so TCS proposed a new delivery date for user acceptance testing  of
12 March 31, 2011.  While the County finally accepted delivery of the Tier 1A module in
13 July 2011—in part as an accommodation to TCS—extensive user acceptance testing
14 still remained to be done.  In February 2012—*more than two years* after TCS had
15 originally promised to finish this single module—the County called a halt to all further
16 testing on the module for the time being, in the hope that resolving errors in the module
17 would be easier if attempted as part of a final integrated PTMS system.  As of the date
18 of this Complaint, the Tier 1A module has never been ready to be used, and has not
19 been used, by the County.

20     47.  Tier 2 – In the Original Contract, the bulk of the work on Tier 2 was
21 supposed to begin in February 2009 and be finished by February 2010.  In fact, serious
22 work on Tier 2 did not even get underway until February 2010.  The parties attempted
23 to learn from the mistakes made by TCS in Tier 1—by using a High Level Design stage
24 missing from Tier 1— but TCS's performance on Tier 2 was similarly deficient.  When
25 TCS first delivered some of the Tier 2 modules to the County for testing in September
26 2011, the software was so defective that the County had to change its testing approach
27 to resemble unit level testing (which was TCS's responsibility) rather than perform the
28 (later-stage) user acceptance testing that was assigned to the County under the parties'

1   agreement.  So, instead of testing the Tier 2 software to ensure it would accurately
2   support the County's business processes, the County's test team was assisting TCS in
3   "debugging" basic coding errors.  Yet even with a lower standard of expected
4   performance, that testing revealed such major flaws in the Tier 2 modules that testing
5   had to be halted altogether and the software returned to TCS for further major
6   correction and rework.

7          48.    The high failure rate of the Tier 2 software resulted—in part—from
8   incomplete and insufficient testing by TCS.  One of TCS's own employees admitted to
9   the County's project manager that TCS had intentionally skipped some of the required
10  testing on those modules to meet the (already extended) deadline for delivery.

11         49.    Tier 3 – This module contained the most complex and challenging
12  functions for the PTMS system.  When the Original Contract was signed, Tier 3 was
13  supposed to be implemented by July 2010.  After a series of revisions to the project
14  plans, the final agreed-upon deadline for implementation of Tier 3 was July 2012. Yet
15  TCS failed to meet that deadline, asking to extend the final PTMS implementation date
16  into 2014, *four years* after the PTMS software was originally supposed to be
17  completed.  TCS has never delivered any of the Tier 3 modules to the County for user
18  acceptance testing.

19         50.    Despite the pattern of repeated problems and delays throughout the PTMS
20  project, TCS's project manager and delivery manager routinely assured the County that
21  the project was on schedule, even after it became clear to the County that the deadlines
22  that modules needed to meet in order to stay on schedule could not be achieved.  TCS
23  frequently did not acknowledge that it was behind schedule and could not have a draft
24  module ready to move on to the next stage of software development and testing, (*see* ¶
25  34), until the deadlines for doing so were imminent.

26  / / /
27  / / /
28  / / /

THEODORA ORINGHER
COUNSELORS AT LAW

*The County Works with TCS, Giving TCS More Time and Money to Complete the PTMS Project*

51.     The County worked in good faith with TCS from the time of the RFP up until its contract with TCS ultimately expired in January 2013. In addition, the County repeatedly relied on the purported expertise of TCS in developing complex custom software applications in making decisions, and the County consulted regularly with TCS on project plans and schedules.

52.     Even though TCS had set forth a project process and outline in its response to the County's RFP, the County was open to negotiations about that proposal when negotiating the SOW to the Original Contract. Then, once that agreement was in effect and TCS's project team had begun the comprehensive review of the Needs Assessment needed to initiate work, the County invited TCS to refine the project plan and schedule. TCS accepted that offer, recommending some changes to which modules were assigned to which tier and seeking to push back all deadlines by one month. The County accepted both recommendations.

53.     When project deadlines began to slip, the County agreed to multiple changes in the project plan and ultimately agreed twice to amend the Original Contract to give TCS more time and money to complete the PTMS project. For example, the County agreed to defer several of the modules initially assigned to Tier 1 into Tier 1A and Tier 3, and several of the Tier 2 modules were also pushed back to Tier 3. Then, on or about June 14, 2010, the County agreed to amend the Original Contract (the "Second Amendment" or "Amendment #2"). Amendment #2 increased the compensation due to TCS under the contract by approximately $1.2 million and extended the project deadline by six months to December 31, 2011. (The first amendment to the Original Contract permitted TCS to move the coding work on Tiers 2 and 3 offshore to India in exchange for a price reduction and increased access to skilled TCS project resources (such as specialized groups for testing), but that amendment did not increase the budget or extend the deadlines of the Original Contract.) On or about June 7, 2011, the County

THEODORA ORINGHER
COUNSELORS AT LAW

agreed to another amendment to the Contract (the "Third Amendment" or "Amendment #3"). This time, the County granted TCS an additional $2.7 million and another year to complete the PTMS project, moving the Final Implementation Date to August 23, 2012 and the contract end date to January 9, 2013.[2]

54.    By September 2011, TCS knew that, even with the prior extensions (totaling 18 months) and additional funds (totaling $3.9 million in Amendments #2 and #3), it would still not be able to complete the PTMS project on-time.  TCS then asked the County for a fourth amendment to the Original Contract.  In this amendment, TCS sought an additional $5.76 million and asked to extend the PTMS deadline by an additional 18 months, from January 9, 2013 to a new contract end date of June 2014.  Thus, the company that represented to the County in 2007 that it had a 96% success rate in completing projects on-time and on budget, and that had promised to complete the PTMS project in three years and for under $8 million, was now asking the County to accept a project that was would take *six years at a total cost of more than $16 million.*

55.    While working with TCS on an ongoing basis to fix problems, the County repeatedly put TCS on notice of its deficient performance—using a series of formal letters, informal emails and discussions, and other means.  Over time, the County paid for the work of several different consultants and other companies to assess certain aspects of the PTMS project and TCS's performance on that project.  Numerous problems were identified and shared with TCS.  Some were fixed, but many were not.

***TCS Software Violates Agreed-Upon Standards, Leading the County to Allow the Parties' Contract to Expire Without Completion of the Project by TCS***

56.    By early 2012, the County was reassessing whether the PTMS project could even be salvaged.  As alleged above, the County had been willing to work

---

[2] TCS initially requested $4.8 million be added to the PTMS budget in Amendment #3, but the County agreed only to an increase of $2.7 million.

THEODORA ORINGHER
COUNSELORS AT LAW

1   with TCS over an extended period of time, and it had even agreed to give TCS

2   additional money and time to complete the PTMS project after the initial round of

3   failures in Tier 1 testing in the fall of 2009.  Tier 1 was intended, in part, to give

4   TCS an opportunity to acquaint itself with the County's business processes and to

5   validate its design of several less-complex modules before taking on the more

6   difficult modules in Tier 2 and Tier 3.  But TCS's repeated failures to deliver

7   functioning Tier 1A and Tier 2 software for user acceptance testing (and to do so

8   on-time) led to increasing concerns on the part of the County.

9        57.    To this end, the County began a systematic review of the PTMS

10  software, to the extent that software had been completed.  This review uniformly

11  found that the PTMS system was poorly designed and would not work as efficiently

12  as intended.  The reviews further found that the PTMS system would not be

13  complete even after TCS had completed its projected work.  Rather, the County

14  could anticipate years of work by its employees post-implementation simply to

15  bring the system up to the capabilities it was intended to have from the beginning.

16       58.    One of the County's reviews, however, found something more. An

17  assessment of the PTMS's technical architecture in late 2012 indicated the

18  software's architecture deviated substantially from the specifications for the

19  technical architecture prepared by TCS as required under the Original Contract, and

20  as finalized and agreed upon by the parties in June 2009.  The deviations would

21  have caused substantial problems with the PTMS program's performance, creating

22  inefficiencies and bottlenecks that would undermine the functional objectives of the

23  County for the PTMS software.  The deviations also created significant security

24  risks that could have threatened the confidentiality and accuracy of the information

25  for hundreds of thousands of taxpayers.  Other deviations involved inefficient

26  design, limited audit capabilities, inadequate documentation and other issues that

27  would prevent the County from achieving its Sustainability Goals for PTMS.

28  (Collectively, these shall be referred to as the "Architectural Deviations.")

THEODORA ORINGHER
COUNSELORS AT LAW

59. The review of the TCS source code identified additional problems. For example, TCS's numerous developers were supposed to follow certain conventions in developing the code. Such standardization would make understanding and later updating of the PTMS software significantly easier. Yet the PTMS software showed a widespread *lack* of standardization. In another example, the review of the PTMS software suggests that, contrary to industry standards, each module was designed in virtually complete isolation from the others. This means, among other things, that rather than have a single program to perform common functions, such as a print menu or a process for generating correspondence, each module would have separate software for performing those functions. As well as being inefficient and creating unnecessary variation across the software, this inefficient design greatly increases the cost of making later changes. For instance, if the County wants to make what should be a simple change, such as altering the description of the "Back" function button, it might have to make the same change in dozens or hundreds of different places in millions of lines of coding, rather than make a single change to a program that was used jointly by all the modules in the PTMS program.

60. Collectively, the problems with the technical architecture of the PTMS software means that the software is beyond salvage without, in essence, starting over from scratch. Indeed, despite the expenditure of millions of dollars and years of time, the PTMS project will provide little, if any, benefit to the County. Having reached this final conclusion in late December 2012, the County had little choice but to bring its contractual relationship with TCS to an end as soon as possible. Accordingly, the County promptly terminated all discussions with TCS regarding further amendments to the Original Contract and gave notice to TCS that their agreement would expire on January 9, 2013 in accord with the term set by the Third Amendment. The contract did expire on that date, with the software far from completion as required by the contract between TCS and the County.

*TCS Induced the County to Enter into the Second and Third Amendments*
*to the Original Contract*

61.    As alleged above, in both the Second Amendment and the Third Amendment to the Original Contract, the County agreed to increase the total maximum compensation payable to TCS and to grant TCS additional time to complete the PTMS project. (*See* ¶ 53.)  In the course of negotiating each amendment, TCS promised the County that it could, if granted the additional time and money, complete the PTMS within the revised budget and project schedule.  These promises shall be collectively referred to as the "Amendment Misrepresentations."

62.    The County is informed and believes, and upon that basis alleges, that at the time TCS entered into each of the amendments,  TCS knew that the Amendment Misrepresentations were false.  TCS knew that it would not, and could not, keep those promises and that it was impracticable to complete the Project by the agreed-upon dates or for the agreed-upon amounts of maximum compensation.  As a result, TCS had no intention of performing the Amendment Misrepresentations at the time it made them.  TCS made the Amendment Misrepresentations solely to induce the County to enter into the Second Amendment and the Third Amendment.  The County would not have entered into either of those amendments had it known that TCS did not intend to keep those promises.

63.    TCS's intent *not* to perform within the revised project budgets and schedules set in Amendment # 2 and Amendment #3 was reflected by how quickly after the execution of each amendment that TCS disavowed its ability to perform in keeping with them.  Only six months after the June 2010 Amendment #2, which provided TCS an extra six months and $1.2 million to complete the PTMS project, TCS asked the County for an additional twelve months and another $4.8 million to complete the same project.  Then, after the County agreed, in the June 2011 Amendment #3, to give TCS twelve more months and $2.7 million, TCS waited only *three* more months before telling the County it could not meet its most recent promises.  TCS ultimately asked the

THEODORA ORINGHER
COUNSELORS AT LAW

1   County to give it yet another eighteen months and an additional $5.76 million to

2   complete the PTMS project.  As noted above, the County refused.

3     64. The County is informed and believes, and upon that basis alleges, that TCS

4   knew at the time that it was negotiating the Second Amendment and the Third

5   Amendment in 2010 and 2011 that the PTMS software under development *already*

6   deviated materially from the technical architecture agreed upon by the parties in 2009

7   (i.e., the "Architectural Deviations").  As ultimately discovered by the County in late

8   2012, the work of dozens of different TCS programmers deviated from the agreed-upon

9   architecture in certain uniform ways.  These uniform deviations can only reflect those

10  programmers' receipt of instructions contrary to the parameters set by the agreed-upon

11  technical architecture.  The nature of the deviations suggests an intent to develop the

12  PTMS software in a manner that would have been simpler, faster, and less expensive

13  for TCS, even though that approach was not in conformity with the agreed-upon

14  technical architecture and would have serious long-term consequences for the

15  efficiency, usability, and maintainability of the PTMS program.

16    65. In January 2012, one of TCS's India-based developers admitted in

17  writing that the PTMS software TCS had developed failed to comply with the

18  agreed-upon technical architecture, but he concluded it was too late to fix it.  The

19  County only discovered this admission by the TCS developer in December 2012,

20  when County staff reviewed TCS documents maintained in a shared document

21  repository.

22    66. In negotiating the Second Amendment and the Third Amendment, TCS

23  never disclosed to the County that, even if TCS was given additional time and money,

24  any completed PTMS project would fail to meet the County's requirements for the

25  PTMS project due to the Architectural Deviations.  TCS knew that the County would

26  not have agreed to either the Second Amendment or the Third Amendment had the

27  County been aware of the Architectural Deviations, yet TCS intentionally concealed the

28  existence of the Architectural Deviations from the County.

1   67.    The County actually and reasonably relied upon TCS to develop the
2   code for the PTMS software in accord with the agreed-upon technical architecture.
3   The County was unaware of the Architectural Deviations until it conducted its
4   review of the PTMS's technical architecture in late 2012.

5   ***Damages to the County from the Failure of the PTMS Project***

6   68.    The County has suffered millions of dollars of damages as a result of
7   TCS's misrepresentations and breaches of contract.  These damages include, but are not
8   limited to:

9   (a) nearly $5 million paid by the County to TCS for services rendered in
10  connection with the PTMS project;

11  (b) millions of dollars spent by the County on employee salaries to work
12  on the PTMS project;

13  (c) hundreds of thousands of dollars that the County spent on a variety of
14  other consultants on the PTMS project beginning in June 2011, much of which would
15  not have been required if TCS had, in fact, possessed the expertise it had represented it
16  had;

17  (d) the incremental costs to the County of maintaining the increasingly
18  obsolete ATS mainframe system for the years it will now take the County to adopt and
19  implement a new PTMS system;

20  (e) the incremental costs incurred by the County in obtaining a new PTMS
21  system, to the extent those costs exceed the maximum amount the County agreed to pay
22  TCS to obtain a fully functional PTMS system (a/k/a the "cost to cover"); and

23  (f) the financial benefits the County could have obtained, either in the form
24  of lost profits, license fees, or reduced operational costs, by marketing a completed
25  PTMS product to other large California counties, some of which had already expressed
26  interest in that product, and as the County is currently doing with its completed ATS
27  2.0 system for the Assessor's office.

28

917668.1/81185.05003

29

*COMPLAINT*

*TCS Deceived the County into Entering into a Contract and Then Repeatedly Amending That Contract to Give TCS More Time and Money to Complete the Same Work*

69.     As alleged more fully above, the County is informed and believes, and upon that basis alleges, that TCS fraudulently induced the County to enter into the Original Contract, the Second Amendment, and the Third Amendment through a systematic series of misrepresentations, as well as its fraudulent concealment of key information that TCS was under a duty to disclose to the County.  TCS intentionally misrepresented the capabilities and expertise it intended to provide to the County to complete the PTMS Project while simultaneously "underbidding" the cost and time required to complete the PTMS Project.  TCS's goal, at all times, was to induce the County to select TCS over the other bidders for the PTMS project, to enter into a contract with TCS, and, subsequently, to increase the time and money TCS would receive to complete the PTMS project.  The County is informed and believes, and upon that basis alleges, that ***TCS knew that once it had begun work on the PTMS project, it would be exceedingly difficult and expensive for the County to replace TCS and that TCS could seek repeated amendments of the contract to obtain additional time and money from the County just to complete the same work that TCS had promised it would do faster and for less money***.  TCS's wrongful acts include, without limitation, the following:

(a)     Misrepresentations:

(i) the Performance Misrepresentation (*see* ¶ 21(a));

(ii) the Timeline Misrepresentation, which was made first in TCS's response to the RFP, (*see* ¶ 21(c)), and was then reaffirmed by TCS in the Original Contract, (*see* ¶ 32(c));

(iii) the Cost Misrepresentation, which was made first in TCS's response to the RFP, (*see* ¶ 21(d)), and was then reaffirmed by TCS in the Original Contract, (*see* ¶ 32(a));

(iv) the Personnel Misrepresentation (*see* ¶ 21(e));

(v) the Experts Misrepresentation. (*see* ¶ 21(f)); and

(vi) the Amendment Misrepresentations (*see* ¶¶ 61, 62).

(b)     Fraudulently Concealed Information: TCS fraudulently concealed:

(i) its intent *not* to provide personnel with the experience and expertise needed to perform in a manner consistent with a CMMI Maturity Level 5, information TCS was required to disclose to the County prior to entering into the Original Contract in order to avoid making the Quality Representation misleading (*see* ¶ 21(b)); and

(ii) the existence of the Architectural Deviations in order to induce the County to enter into Amendment #2 and Amendment #3.

70.     The County justifiably and reasonably relied on the Performance Misrepresentation, Quality Representation, Timeline Misrepresentation, Cost Misrepresentation, Personnel Misrepresentation, and Experts Misrepresentation in deciding to contract with TCS and to enter into a contract with TCS in July 2008.   But for these misrepresentations and deceptive representations, the County would *not* have entered into a contract with TCS.

71.     The County justifiably and reasonably relied on the Amendment Misrepresentations and on the absence of any disclosure of the Architectural Deviations by TCS in deciding to enter into the Second Amendment and the Third Amendment. But for these misrepresentations and concealed facts, the County would *not* have entered into the Second Amendment or the Third Amendment with TCS.

72.     Each of the representations and misrepresentations by TCS identified herein was made with a fraudulent intent and was false and/or deceptive. More specifically:

(a)     The County is informed and believes, and upon that basis alleges, that, the Performance Misrepresentation was false;

1          (b)    with respect to the Quality Representation, TCS knew, yet failed to

2  disclose to the County, that the personnel it would provide for the conduct of the PTMS

3  project lacked the knowledge or expertise needed to provide software development

4  services consistent with the alleged CMMI Maturity Level 5, which disclosure was

5  required in order to avoid making the Quality Representation misleading;

6          (c)    the Timeline Misrepresentation was false because TCS knew it was

7  impracticable to complete the PTMS project within the time period first proposed in its

8  response to the RFP and then incorporated into the Original Contract, and TCS did not,

9  at either time, intend to complete the PTMS software on a schedule in keeping with the

10  Timeline Misrepresentation;

11          (d)    the Cost Misrepresentation was false because, in light of the work

12  required, TCS knew it was impracticable to complete the TCS project under the budget

13  first proposed in TCS's response to the RFP and then set in the Original Contract, and

14  TCS did not, at either time, intend to complete the PTMS software on a budget in

15  keeping with the Cost Misrepresentation;

16          (e)    the Personnel Misrepresentation was false and TCS had no

17  intention, at the time it submitted the response, of ensuring that all of the personnel it

18  promised to the County for the PTMS project would in fact work on it (or even that

19  personnel of equivalent experience and expertise would work on the PTMS project);

20          (f)    the Experts Misrepresentation was false, and, although TCS may

21  have formally engaged Ms. Sexton and Mr. Birchfield, TCS had no intention of relying

22  on those experts' time and services to cover TCS's own deficiencies in the subject

23  matter of California property taxes;

24          (g)    the Amendment Misrepresentations were false because, in light of

25  the work required, TCS knew it was impracticable to complete the PTMS project

26  within the budget and project deadlines agreed to by TCS in the Second Amendment

27  and in the Third Amendment, and TCS did not, at either time, intend to complete the

28

1  PTMS software on a budget and timeline in keeping with the Amendment
2  Misrepresentations; and

3             (h)    TCS knew, yet intentionally failed to disclose to the County, the
4  existence of the Architectural Deviations.  TCS was under a duty to disclose the
5  Architectural Deviations to the County because:

6                    (i)    TCS was in a confidential relationship with the County as a
7  result of its contract, and it owed the County a duty of good faith and fair dealing;

8                    (ii)    the existence of the Architectural Deviations was an
9  important fact that was known only to TCS and could not have been reasonably
10  discovered by the County; and

11                   (iii)   TCS actively concealed the existence of the Architectural
12  Deviations from the County.

13     73.    The County did not discover, could not have reasonably discovered, and
14  had no reason to suspect, wrongdoing by TCS until 2012, or, at the very earliest, in the
15  spring of 2011.

16             (a)  Prior to the spring of 2011, the County had been aware of the process
17  issues facing the PTMS project, but the only problems with the actual PTMS software
18  of which the County was aware were identified in the Tier 1 user acceptance testing in
19  late 2009.  While the County was concerned about the results of that Tier 1 testing, the
20  County had always intended the Tier 1 stage to give TCS an opportunity to acquaint
21  itself with the County's business processes and to validate its design of several less-
22  complex modules before taking on the more difficult modules in Tier 2 and Tier 3.  The
23  County had attempted to address those issues with TCS, but when the same problems
24  afflicted the Tier 1A testing in the spring of 2011 and then again with the Tier 2 testing
25  in August 2011, the County became increasingly concerned.  Even then, however, the
26  County had no reason to question more than TCS's competence.

27             (b)  Several events in 2012, working together, cast TCS's original
28  representations, its actions and its failures in a new light.  First, TCS's request to add

1  another $5,760,000 and 18 more months to the project raised further doubts about

2  TCS's ability to complete the project successfully. (*See* ¶ 54.)  While the County was

3  willing to discuss TCS's request for a further amendment to the parties' agreement, the

4  County was only willing to do so if adequate safeguards and limitations were included

5  to protect the County and its taxpayers.  Even as those discussions were ongoing,

6  however, the County's substantive review of the PTMS system's source code

7  determined that the technical architecture of the program TCS was requesting more

8  money and time to build would not, and could not, achieve the objectives agreed to

9  years earlier.[3] (*See* ¶¶ 58-59.)  Then, in December 2012, the County discovered that

10  TCS had been aware of that fact since at least January 2012. (*See* ¶ 65.)  Taken

11  together, these factors provide a strong inference that TCS's only goal was to continue

12  to extract additional time and money from the County for a project that TCS already

13  knew would never meet the objectives it had promised to the County from the

14  beginning.  Moreover, these factors cast serious doubt on the accuracy and good faith of

15  TCS's original representations to the County in negotiating the Original Contract and in

16  inducing the County to enter into Amendment #2 and Amendment #3.

17          (c)  Had TCS had as much success and expertise in completing projects on

18  time and on budget as it represented to the County that it had (i.e. the Performance

19  Misrepresentation), then TCS's need to ultimately seek a doubling of the promised

20  PTMS budget and timelines suggests that TCS must have known from the beginning

21  that it was impracticable, if not outright impossible, to meet its original promises (i.e.

22  the Timeline Representation and the Cost Misrepresentation).  Indeed, TCS started the

23

24  _____

25  [3]  Notably, the County was never under any contractual or other legal
     responsibility to review the PTMS source code or to verify the program's technical

26  architecture complied with the agreed-upon architecture.  It was only in response to
     TCS's repeated failures that the County was compelled to expend the time and money

27  needed to perform this review.

28

THEODORA ORINGHER
COUNSELORS AT LAW

1 PTMS project with the benefit of the exhaustive 6,000 pages Needs Assessment
2 commissioned (and paid for) by the County, giving TCS a substantial head start on the
3 project as compared to many other custom application development projects.  The
4 information provided by the County to TCS in the Needs Assessment should have also
5 made projecting the necessary costs and timelines for PTMS easier by providing a
6 clearer roadmap of what the final software would need to do.

7    (d)  Conversely, TCS's abysmal performance on the PTMS project casts
8 grave doubts as to the accuracy of TCS's alleged 96% success rate in such development
9 projects.  TCS's inability even to create software in accord with project requirements,
10 let alone create software that performed up to industry standards, also created grounds
11 for the County to begin questioning the truthfulness of TCS's representations of the
12 quality of its personnel and processes (e.g., the Quality Representation) once TCS's
13 abject failures became apparent in late 2012.

14   74. The County's damages from TCS's misrepresentations and fraudulent
15 statements did not begin to accrue until the last three years.

16    (a)  With respect to the Timeline Misrepresentation, the County suffered
17 no damages until TCS failed to complete the PTMS project within the promised time
18 period (twenty-five months).  As the contract commenced on July 15, 2008, the earliest
19 date on which the County could have suffered damages from the falsity of these
20 promises was in August 2010.

21    (b)  With respect to the Cost Misrepresentation, the County did not ever
22 pay TCS more than the amount (approximately $8 million) for which TCS initially
23 offered to complete the project.  Accordingly, the monies the County paid to TCS for
24 the PTMS project between 2008 and 2012 (approximately $5 million) did not constitute
25 damages from the Cost Misrepresentation until the County discovered, in late 2012,
26 that the PTMS software under development deviated substantially from the agreed-
27 upon technical architecture and was, as a consequence, unsalvageable.  It was only then
28 that the County knew, or reasonably could have known, that the monies it had paid to

1 TCS would not result in the delivery to the County of a functioning PTMS system.  In

2 the alternative, the County could anticipate damages from the Cost Misrepresentation,

3 at the very earliest, in September 2011, when TCS first asked for an amendment to the

4 parties' agreement (the Third Amendment) that would raise the total amount to be paid

5 by the County to TCS above the amount in the Cost Misrepresentation.

6     (c)  Damages for the Performance Misrepresentation would be incurred at

7 the same time as damages for the Timeline Misrepresentation and Cost

8 Misrepresentation discussed in the preceding paragraphs.   The Performance

9 Misrepresentation was predicated on TCS's ability to complete projects on-budget and

10 on-time, so any damages suffered by the County as a result of the falsity of the

11 Performance Misrepresentation would have accrued at the same time as for those other

12 misrepresentations.

13 **FIRST CAUSE OF ACTION**

14 (Promissory Fraud)

15 (Against Both Defendants)

16   75. The County realleges and incorporates herein by reference each and

17 every allegation contained in paragraphs 1-74 as though set forth in full.

18   76. Prior to the July 15, 2008 effective date of the Original Contract, TCS

19 made the Timeline Misrepresentation, Cost Misrepresentation, Personnel

20 Misrepresentation, and Experts Misrepresentation to the County. (*See* ¶

21 21(c),(d),(e),(f)), ¶ 32(a),(c)  (collectively, the "False Promises").)  TCS made the

22 Amendment Misrepresentations prior to the June 2010 execution of the Second

23 Amendment and prior to the June 2011 execution of the Third Amendment.  (*See* ¶¶

24 61, 62.)

25   77. TCS  had no intention of living up to its False Promises or the

26 Amendment Misrepresentations because it knew there was no way it could or would

27 perform the PTMS project as promised and in keeping with the costs and deadlines

28 it had represented to the County.  Instead, TCS always expected that, once it was

THEODORA ORINGHER
COUNSELORS AT LAW

1    selected, it would reduce costs by providing less experienced and less expensive

2    personnel than it had promised, and, when the project took longer than promised,

3    TCS could go back to the County for more time and money, secure in the

4    knowledge that the County could not switch vendors partway through the process.

5        78.     TCS made the False Promises with the specific intent to induce the

6    County to enter into the Original Contract, and it made the Amendment

7    Misrepresentations with the specific intent to induce the County to enter into the

8    Second Amendment and the Third Amendment.

9        79.     Throughout the tenure of TCS's relationship with the County, TCS

10    systematically and continuously failed to meet the cost and deadlines it agreed to,

11    both in the Original Contract and its amendments. TCS also failed to deliver most

12    of the employees it promised to the County, including the property tax experts

13    whose input on the PTMS project TCS considered "essential."

14        80.     The County would not have entered into the Original Contract had it

15    known TCS would not keep its False Promises. The County actually and reasonably

16    relied on its partner TCS to fulfill its False Promises and to act in good faith.

17        81.     The County would not have entered into the Second Amendment and

18    the Third Amendment had it known TCS had no intention of performing on the

19    Amendment Misrepresentations.

20        82.     As a direct and proximate result of the fraud and deceit of TCS, the

21    County has been damaged in an amount that will be determined according to proof.

22    The County is informed and believes, and upon that basis alleges, that this amount

23    exceeds $10 million.

24        83.     The County is informed and believes, and upon that basis alleges, that

25    in doing the acts hereinabove set forth, TCS has acted with oppression, fraud and

26    malice, without justification, and with the intent to damage the County. The County

27    is further informed and believes, and upon that basis alleges, that it is therefore

28    entitled to an award of exemplary damages in an amount according to proof.

THEODORA ORINGHER
COUNSELORS AT LAW

## SECOND CAUSE OF ACTION

(Fraudulent Misrepresentation)

(Against Both Defendants)

84.     The County realleges and incorporates herein by reference each and every allegation contained in paragraphs 1-83 as though set forth in full.

85.     Prior to the July 15, 2008 effective date of the Original Contract, TCS made the Performance Misrepresentation. (*See* ¶ 21(a).) The County is informed and believes, and upon that basis alleges, that TCS made this material misrepresentation with knowledge of its falsity.

86.     The County actually and reasonably relied on the Performance Misrepresentation in entering into the Original Contract, and the County would not have entered into the Original Contract had it known of the falsity of the Performance Misrepresentation.  Indeed, the County actually and justifiably relied on TCS to not make false representations, but rather, to be truthful and to act in good faith.  Before the signing of the Original Contract, the County was in no position to discover the falsity of TCS's misrepresentations even with the exercise of due diligence.

87.     The County is informed and believes, and upon that basis alleges, that TCS made the Performance Misrepresentation with the intent to induce the County to enter into the Original Contract.  At the time that the County entered into the Original Contract and took the actions herein alleged, it was ignorant of the falsity of the Performance Misrepresentation.

88.     As a direct and proximate result of the fraud and deceit of TCS, the County has been damaged in an amount that will be determined according to proof. The County is informed and believes, and upon that basis alleges, that this amount exceeds $10 million.

89.     The County is informed and believes, and upon that basis alleges, that in doing the acts hereinabove set forth, TCS has acted with oppression, fraud and

1  malice, without justification, and with the intent to damage the County.  The County

2  is further informed and believes, and upon that basis alleges, that it is therefore

3  entitled to an award of exemplary damages in an amount according to proof.

### THIRD CAUSE OF ACTION

(Fraudulent Concealment)

(Against Both Defendants)

7       90.    The County realleges and incorporates herein by reference each and

8  every allegation contained in paragraphs 1-89 as though set forth in full.

9       91.    The County is informed and believes, and upon that basis alleges, that

10  TCS intentionally failed to disclose and actively concealed important facts from the

11  County prior to the date the Original Contract was entered into.  More specifically,

12  TCS concealed its then-present intent *not* to provide personnel with the experience

13  and expertise needed to perform in a manner consistent with a CMMI Maturity

14  Level 5, information TCS was required to disclose to the County in order to avoid

15  making the Quality Representation deceptive and misleading.  (*See* ¶ 21(b).)

16       92.    By concealing this information, TCS intended to deceive, and did

17  deceive, the County into entering into the Original Contract.

18       93.    Because TCS repeatedly represented to the County that it was a CMMI

19  Maturity Level 5 organization, and because TCS used this certification as proof of

20  its expertise in the processes for developing custom software, TCS owed the County

21  a duty to disclose any facts which materially qualified the accuracy of that

22  representation, including, but not limited to, the fact that TCS did not intend to

23  provide the County with personnel with the expertise needed to implement

24  processes consistent with TCS's alleged global-wide CMMI Maturity Level 5 rating

25  (the "Material Qualifications").  The Material Qualifications were known only to

26  TCS, and the County had no means to discover them prior to entering into the

27  Original Contract.

28

94.    The County actually and reasonably relied on TCS's Quality Representation in entering into the Original Contract.

95.    TCS failed to disclose and concealed the Material Qualifications with the intent to deceive the County and to induce the County to enter into the Original Contract.  At the time that the County entered into the Original Contract and took the actions herein alleged, it was ignorant of the Material Qualifications.

96.    Had the County known of the Material Qualifications at the time it entered into the Original Contract, the County would not have entered into the agreement.

97.    As a result of entering into the Original Contract, TCS was in a confidential relationship with the County, and it owed the County a duty of good faith and fair dealing.

98.    The County is informed and believes, and upon that basis alleges, that TCS intentionally failed to disclose, and actively concealed, important facts from the County prior to the dates that Amendment #2 and Amendment #3 were entered into. More specifically, TCS not only failed to disclose, but actively concealed, the existence of the Architectural Deviations—important information that TCS was required to disclose to the County. (*See* ¶¶ 63-66.)

99.    The Architectural Deviations were known only to TCS, and the County had no reasonable means to discover them prior to entering into Amendment #2 and Amendment #3.

100.    By concealing the Architectural Deviations, TCS intended to deceive, and did deceive, the County into entering into Amendment #2 and Amendment #3. At the time that the County entered into Amendment #2 and Amendment #3, it was ignorant of the Architectural Deviations.

101.    The County actually and reasonably relied on TCS's deceptive statements in entering into Amendment #2 and Amendment #3.

1   102.   Had the County known of the Architectural Deviations at the time it

2   entered into Amendment #2 and Amendment #3, the County would not have entered

3   into either of those amendments.

4   103.   As a direct and proximate result of the fraud and deceit of TCS in

5   concealing the Material Qualifications and the Architectural Deviations, the County

6   has been damaged in an amount that will be determined according to proof.  The

7   County is informed and believes, and upon that basis alleges, that this amount

8   exceeds $10 million.

9   104.   The County is informed and believes, and upon that basis alleges, that

10   in doing the acts hereinabove set forth, TCS has acted with oppression, fraud and

11   malice, without justification, and with the intent to damage the County.  The County

12   is further informed and believes, and upon that basis alleges, that it is therefore

13   entitled to an award of exemplary damages in an amount according to proof.

14                          **FOURTH CAUSE OF ACTION**

15                            (Negligent Misrepresentation)

16                              (Against Both Defendants)

17   105.   The County realleges and incorporates herein by reference each and

18   every allegation contained in paragraphs 1-104 as though set forth in full.

19   106.   Prior to the July 15, 2008 effective date of the Original Contract, TCS

20   made the Performance Misrepresentation.  (*See* ¶ 21(a).)  This statement was false.

21   The County is informed and believes, and has alleged, that TCS made this material

22   misrepresentation with knowledge of its falsity.  In the alternative, the County

23   alleges that TCS had no reasonable grounds for believing the Performance

24   Misrepresentation was true when it included the Performance Misrepresentation in

25   its response to the County's RFP.

26   107.   The County actually and reasonably relied on the Performance

27   Misrepresentation in entering into the Original Contract, and the County would not

28   have entered into the Original Contract had it known of the falsity of the

THEODORA ORINGHER
COUNSELORS AT LAW

1  Performance Misrepresentation.  Indeed, the County actually and justifiably relied
2  on TCS to not make false representations, but rather, to be truthful and to act in
3  good faith.  Before the signing of the Original Contract, the County was in no
4  position to discover the falsity of TCS's misrepresentations even with the exercise
5  of due diligence.

6  　　　108.   The County is informed and believes, and upon that basis alleges, that
7  TCS made the Performance Misrepresentation with the intent to induce the County
8  to enter into the Original Contract.  At the time that the County entered into the
9  Original Contract and took the actions herein alleged, it was ignorant of the falsity
10  of the Performance Misrepresentation.

11  　　　109.   As a direct and proximate result of the fraud and deceit of TCS, the
12  County has been damaged in an amount that will be determined according to proof.
13  The County is informed and believes, and upon that basis alleges, that this amount
14  exceeds $10 million.

15  **FIFTH CAUSE OF ACTION**

16  (Breach of Contract)

17  (Against TCS America Only)

18  　　　110.   The County realleges and incorporates herein by reference each and
19  every allegation contained in paragraphs 1-109 as though set forth in full.

20  　　　111.   The County and TCS America entered into the Original Contract,
21  which had an effective date of July 15, 2008.  The Original Contract was later
22  amended three times, culminating in the Third Amendment.

23  　　　112.   The County has complied with and performed all of the terms and
24  conditions of the Original Contract, as amended, or has been excused from such
25  compliance and/or performance by virtue of TCS America's waiver or breach
26  thereof.

27

28

113.   The County has satisfied all conditions that it was required to meet in order for TCS America to be required to perform all of its duties under the Original Contract, as amended.

114.   TCS America has breached the Original Contract, as amended, by, without limitation, the following:

(a) failing to produce complete and functioning PTMS software by the end of the term for the Third Amendment on January 9, 2013, let alone by the (earlier) final implementation date of August 23, 2012 set by the Third Amendment (¶¶ 1, 2);

(b) failing to produce PTMS software in compliance with the technical architecture that was agreed upon by the parties in accord with the rules and procedures set forth in the Statement of Work attached to the Third Amendment (*see* ¶ 32(h));

(c) failing to perform the development work on the PTMS software in a "professional manner according to generally accepted industry standards," as required by paragraph 15 of the Original Contract;

(d) failing to perform all work under the Original Contract to the County's satisfaction, as required by paragraph 23 of the Original Contract;

(e) failing to perform all work "diligently, carefully, and in a good and workman-like manner[,]" as required by paragraph 23 of the Original Contract; and

(f) (for those modules that the County formally accepted for delivery under the Original Contract, as amended) breaching TCS's warranty in paragraph 15 of the Original Contract, as amended, that the modules would "conform to and provide the functionality in accord with [their] specifications" for at least 180 days, when those modules were defective and—with two minor exceptions—incapable of being used in production.

115.   As a direct and proximate result of these breaches of contract by TCS America, and of each of them, the County has been damaged in an amount that will

THEODORA ORINGHER
COUNSELORS AT LAW

1  be determined according to proof.  The County is informed and believes, and based
2  thereon alleges, that this amount exceeds $10 million.

3

4                              **PRAYER FOR RELIEF**

5       WHEREFORE, the County prays for judgment against TCS Limited, as follows:

6  FOR THE FIRST, SECOND, THIRD, AND FOURTH CAUSES OF ACTION

7       1.      For general damages according to proof, but which are believed to exceed

8  $10 million;

9       2.      For the costs herein incurred;

10      3.      For such other relief as the Court may deem just and proper;

11

12      AND FOR THE FIRST, SECOND, AND THIRD CAUSES OF ACTION ONLY

13      4.      For punitive and exemplary damages in an amount according to proof.

14

15      WHEREFORE, the County prays for judgment against TCS America, as follows:

16  FOR THE FIRST, SECOND, THIRD, FOURTH, AND FIFTH CAUSES OF

17  ACTION

18      1.      For general damages according to proof, but which are believed to exceed

19  $10 million;

20      2.      For the costs herein incurred;

21      3.      For such other relief as the Court may deem just and proper;

22

23      AND FOR THE FIRST, SECOND, THIRD AND FOURTH CAUSES OF

24  ACTION

25      4.      In the alternative to an award of general damages, for rescission of the

26  Original Contract, as amended, between the County and TCS America and for

27  consequential damages;

28

1         AND FOR THE FIRST, SECOND, AND THIRD CAUSES OF ACTION ONLY

2     5.    For punitive and exemplary damages in an amount according to proof;

3

4

5  DATED: April 30, 2013       THEODORA ORINGHER PC

6

7                 By:

8                     Todd C. Theodora

9                     Allan L. Schare

                        Jason L. Haas

10                     Attorneys for Plaintiff County of Orange

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

917668.1/81185.05003

45

*COMPLAINT*

**JURY TRIAL DEMAND**

Plaintiff County of Orange hereby demands a trial by jury.

DATED: April 30, 2013

THEODORA ORINGHER PC

By: _____
Todd C. Theodora
Allan L. Schare
Jason L. Haas
Attorneys for Plaintiff County of Orange